## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| HERITAGEMARK, LLC, an Oklahoma Limited Liability Company, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNUM LIFE INSURANCE COMPANY OF AMERICA, a Maine Corporation, <br><br> Defendant. | Case No. _____ |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Heritagemark, LLC ("Heritagemark" or "Plaintiff"), individually and on behalf of all others similarly situated group Certificate Owners and individual policyholders, for this Class Action Complaint against Defendant UNUM Life Insurance Company of America ("UNUM" or "Defendant"), states and alleges as follows:

## NATURE OF ACTION

1.      This is a class action brought on behalf of Plaintiff and similarly situated Certificate Owners of group universal life ("GUL") insurance policies and/or individual policyholders of individual universal life ("IUL") insurance policies issued by UNUM and administered by UNUM or its agent(s). The UNUM GUL and UNUM IUL insurance policies will be referred to collectively herein as "UNUM UL Policy" or "UNUM UL Policies." The claims of Plaintiff and members of the proposed class are based on the

language of their respective UNUM UL Policies, the terms of which are substantially similar for all UNUM UL Policies, and not subject to individual negotiation.

2.      Plaintiff Heritagemark holds title to the exemplar UNUM UL Policy attached to this complaint (hereinafter sometimes referred to as the "Exemplar UNUM UL Policy"), on behalf of Mr. Moritz Roever, who is the Entitlement Holder as defined in the Exemplar UNUM UL Policy. Mr. Roever, who is currently a Florida resident, has beneficial ownership in the Exemplar UNUM UL Policy and holds legal title to the Securities Account, as defined in the Exemplar UNUM UL Policy, under Oklahoma Uniform Commercial Code Section 8-102.

3.      Mr. Roever purchased the Exemplar UNUM UL Policy in question in approximately April 2014 from a private group who had purchased it from a conservatorship. A true and correct copy of the Exemplar UNUM UL Policy issued to Charles DeAinza, and then purchased by Mr. Roever, is attached hereto as Exhibit A. At the time Mr. Roever purchased the policy, he was a citizen and resident of Germany so he retained Plaintiff Heritagemark to serve as the securities intermediary. As a result, the Exemplar UNUM UL Policy is a viaticated policy.

4.      A viatical settlement is the sale of an insurance policy owner's existing life insurance policy to a third party for more than its cash surrender value, but less than its net death benefit. Such a sale provides the initial policy owner with a lump sum payment and the third party purchaser becomes the new owner of the policy, pays the monthly premiums, and receives the full benefit of the policy when the insured dies. By receiving a lump sum payment, the initial policy holder is free to use that money however he or she

sees fit including as an investment opportunity, paying for medical expenses, reducing or eliminating credit card debt or a mortgage, among other benefits.[1]

5.     Heritagemark seeks to represent owners of UNUM UL Policies who have had to pay more periodically to keep their life insurance because UNUM increased their Monthly Cost of Insurance ("COI") rates, for coverage at least once since 2017, despite UNUM's profiting from favorable future mortality experience.

6.     This is a class action for breach of contract and conversion to recover amounts that UNUM charged Plaintiff and the proposed class in excess of the amounts authorized by the express terms of their UNUM UL Policies. Plaintiff's breach of contract claim is exclusively supported by the written provisions of the UNUM UL Policy that plaintiff owns; the provisions of which are materially the same as those policies held by other members of the proposed class. The written provisions giving rise to the claims alleged in this lawsuit are not subject to individual negotiation.

7.     The plain language of the UNUM UL Policies specify that monthly COI rates "will be based on" and "determined by," UNUM's expectations of future mortality experience.

8.     UNUM has breached, and is continuing to breach, the express terms of the UNUM UL Policies, including the implied covenant of good faith and fair dealing, by failing to take into account, in whole or in part, UNUM's expectations of future mortality experience, and/or not even forming or considering its expectations of future mortality

---

[1]     The Exemplar UNUM UL Policy purchased by Plaintiff was originally issued to Charles DeAinza of Houston, Texas, who, as an employee of Toshiba International (Group No. 830), was eligible to purchase the Exemplar UNUM UL Policy effective December 1, 1992, with an employee death benefit of $90,000 and a spousal coverage amount of $45,000. The owner number on the Exemplar UNUM UL Policy is 465089457 and the Certificate Number on the policy is 2208709.

experience when determining and then increasing the COI rates for owners of UNUM UL Policies.

9.     When determining or adjusting COI rates, the UNUM UL Policy language requires UNUM to decrease COI rates if it experiences an improvement in expected mortality. In other words, if UNUM expects fewer people to die at a given rate than originally anticipated, then it will expect to pay out fewer death benefits at that previously determined rate. If Defendant pays out fewer death benefits over time, then Defendant's risk of insurance decrease because the cost of providing life insurance to the owners of UNUM UL Policies goes down.

10.     Under the express terms of the exemplar UNUM UL Policy, the COI rate should correspondingly decrease instead of UNUM double-dipping by again profiting from raising and/or not decreasing the COI.

11.     It is well-documented that people are living longer now than they did 40 years ago (with some COVID-related exceptions). In other words, mortality rates have improved significantly over the past several decades and UNUM's future mortality experience has, likewise, improved to its favor; *i.e.*, people are generally living longer and fewer death claims are being paid out as early as UNUM had originally expected.

12.     Despite the improvement in expected mortality, UNUM increased the monthly COI charges that owners of UNUM UL Policies were required to pay to keep the insurance in place at least once in the past five years. UNUM should have acted as expressly promised and lowered the COI rather than increasing it. Instead, UNUM was profiting from the positive change in expectations of future mortality experience—*i.e.*, UNUM's insureds are living longer—during that time.

13.     UNUM also improperly profited by taking the policy holders' cash value in breach of the express terms of the UNUM UL Policies.

14.     Simply put, and at a minimum, UNUM breached its obligations to "determine" COI rates "based on" UNUM's future mortality experience whenever it increased COI rates (or failed to adjust COI rates downward), even though UNUM's future mortality experience improved during the relevant period. No provision of the UNUM UL Policies excuses Defendant from the contractual mandate that it base its COI rates on future mortality experience.

15.     In light of the specific language of the UNUM UL Policies, defendant owed a duty to its policyholders to monitor its expected mortality rates.

16.     Accordingly, when UNUM reviewed its mortality experience and discovered that its mortality experience changed in its favor, the COI rates should have decreased; *i.e.*, owners of UNUM UL Policies were and are living longer than UNUM originally anticipated when the COI was determined for UNUM UL Policies when they incepted. Once the COI rates decreased as provided in the UNUM UL Policies, UNUM was contractually obligated to reduce the COI rates, making the policies more affordable for UNUM UL policyholders.

17.     Defendant has reported to its investors in annual reports and regulatory filings—documents that UNUM did not provide to its policyholders and those policyholders likely never saw—over the past several years that mortality experiences were better than it expected. Because mortality rates have steadily and significantly improved over the past two decades, consistent with UNUM's own mortality experience, and, because Defendant is contractually obligated to determine the COI rates based on its

expectations of future mortality experience; *i.e.*, the COI rates for Plaintiff's UNUM UL Policy and owners of other UNUM UL Policies should have decreased. But they did not. The COI rate charged by UNUM to owners of UNUM UL Policies, including Plaintiff, either stayed the same or increased significantly, year after year.

18.     Plaintiff was unaware that UNUM was engaging in wrongdoing because only UNUM possesses its internal expectations as to future mortality experience on which COI rates are supposed to be based; UNUM does not disclose this information to policyholders; UNUM's annual statements to policyholders concealed its internal, annually updated mortality expectations; and a reasonable policyholder would not have known of UNUM's breaches without disclosure by UNUM of its mortality expectations each year.

19.     Based upon information and belief, UNUM has been charging, through the use of deductions, and continues to deduct, excessive COI charges since at least January 1, 2010. Additionally, based upon information and belief, every year since 2010, UNUM has failed to adjust those COI charges based on improved mortality expectations, as required by the Policy. It is now well-documented that nationwide mortality expectations have, as a general rule, improved significantly since January 1, 2010.

20.     Despite annual reviews conducted on future mortality which resulted in improved mortality expectations every year and corresponding decrease in mortality risk, UNUM never adjusted its COI rates based on its updated, annual, refreshed mortality assumptions, nor did UNUM take improving mortality rates into account as part of its COI determination process, all of which should have resulted in far lower COI rates than those actually charged.

21.     In the face of the substantially improving future mortality experience that has inured to the benefit of UNUM, the insurer wrongly concluded that its policies granted it the right to increase COI without considering the expectations of future mortality as the primary factor to be considered as part of the COI formula. The increase in COI on the UNUM UL Policies is improper, unsupported by, and in violation of, the express terms of the UNUM UL policies, causing harm to Plaintiff and all of the class members.

22.     The terms of UNUM UL Policies also provide for a "cash value" consisting of monies held in trust by Defendant for Plaintiff and the proposed class, and Defendant is contractually bound to deduct from the cash value only those charges that are explicitly identified and authorized by the policy's terms.

23.     The Exemplar UNUM UL Policy describes Cash Value as follows:

"If a premium is paid on or before the Certificate Date, Your Cash Value on the Certificate Date is equal to the total premium paid less the Premium Expense Charge. Otherwise, the Cash Value on the Certificate Date is zero.

On any date thereafter, Your Cash Value is equal to:

a) the Cash Value at the start of the Policy Month; less (-)

b) the monthly Administrative Expense Charge for the Policy Month; less (-)

c) the Cost of Insurance and the Cost of Riders for the Policy Month; plus (+)

d)  interest credited on the net of the above three items from the start
of the Policy Month to the day on which the Cash Value is being
determined; plus (+)

e)  premiums less the Premium Expense Charge credited to the
insurance since the start of the Policy Month; plus (+)

f)  interest on the premiums less the Premium Expense Charge from
the day(s) the premiums are credited to the Cash Value to the day
on which the Cash Value is being determined."

24.     Despite unambiguous language in the Exemplar UNUM UL Policy, which
is a fully integrated insurance agreement, Defendant breaches the policy by deducting
charges from Plaintiff's cash value in excess of the amounts specifically permitted by the
policy, and those breaches are continuous and ongoing.

25.     Defendant has caused material harm to Plaintiff and the proposed class by
improperly draining monies they have accumulated in the cash values under their
policies. Every unauthorized dollar taken from policy owners is one less dollar that can
earn interest and be used to pay future premiums; use for policy loans; or withdraw as
cash.

26.     Plaintiff brings this case as a class action under Federal Rule of Civil
Procedure 23, individually and on behalf of the following persons (the "Class"):

"All persons who own or owned a universal life insurance policy
issued or administered by Defendant, the terms of which provide or
provided for:

(1) an insurance or cost of insurance charge or deduction

calculated using a rate that is determined based on Defendant's

expectations as to future mortality experience;

(2) additional but separate policy charges, deductions, or

expenses;

(3) an investment, interest-bearing, or savings component; and

(4) a death benefit."

27.     On behalf of itself and the class, Plaintiff seeks to recover compensatory

and punitive damages, as well as obtain orders for declaratory and injunctive relief.

## **PARTIES**

28.     Plaintiff Heritagemark, LLC is a limited liability company organized and

existing under the laws of Oklahoma, with a principal place of business in Oklahoma

City, Oklahoma. Heritagemark holds legal title to the Exemplar Policy and is the Policy

Owner recorded at Defendant UNUM.

29.     Defendant UNUM is a corporation incorporated under the laws of the State

of Maine with its principal place of business in Tennessee.

30.     UNUM issued the Exemplar UNUM UL Policy on various standard policy

forms drafted and used by Defendant from time to time; the material terms of UNUM UL

Policies were substantially similar in all material respects both with each other and all

other universal life insurance policies that Defendant issued to the proposed class. Based

upon information and belief, none of the owners of UNUM UL Policies has received any

COI rate decrease since issuance.

## JURISDICTION AND VENUE

31.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2), because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

32.     Upon information and belief, less than two-thirds of the members of the proposed class in the aggregate are citizens of the State of Texas. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

33.     This Court has personal jurisdiction over UNUM because it is registered to do business in Texas; it has been licensed to sell life insurance in Texas since 1974; it maintains offices in Texas from which it operates, conducts, engages in, or is carrying on a business or business venture in Texas; and Defendant has sold universal life insurance policies to and collected premiums on UNUM UL Policies from Texas residents.

34.     Defendant has also breached one or more contracts in Texas by failing to perform acts required by its insurance contracts to be performed within Texas.

35.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant is a citizen of this district and maintains offices for the conduct of its business, including the business involved in this case, in Houston (located in this district), and a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this district.

## FACTUAL BACKGROUND

### UNUM's Universal Life Insurance Program

36.     A group universal life policy is a universal life insurance product underwritten and offered to a group. A group universal life policy is most commonly purchased by employees directly from the insurer that sets up a group program with employers who are looking to make life insurance coverage available to their employees. An individual universal life policy is a product offered to individual policyholders.

37.     A universal life insurance policy is a type of permanent life insurance (*i.e.*, it can be maintained even after an employee leaves his or her job) that combines death benefits with a savings or investment component—this savings/investment component is known often as the policy's "Cash Value."

38.     The Cash Value set out above consists of money held in trust by Defendant and represents amounts contributed by the owner of the policy to his or her account in excess of the COI, plus any interest accrued. The UNUM UL Policies provide flexible premium payments and reliable Cash Value growth. Over time, a policy can accumulate a significant Cash Value. The policy owner can withdraw the Cash Value at any time–at any age–generally without tax penalties.

39.     Defendant deducts COI from the policy owner's Cash Value in an amount that is to be based on the COI formula set out in the UNUM UL Policy contract. Policy holders may choose to pay Defendant the premiums, via payroll deductions or through lump sums. Policyholders may also choose to pay Defendant only the COI, or to make additional payments to the Cash Value of a policy. The Cash Value can, in turn, be used to pay the COI, or can be borrowed or withdrawn. The insurer leaves the additional sums

as Cash Value in the policy account which earns a guaranteed minimum fixed or higher interest rate for Cash Value growth.

40.     The COI represents Defendant's risk—a determination of when Defendant will have to pay the death benefit (the policy's "coverage amount") to the policy's beneficiary when the insured dies. The payment of COI charges to cover Defendant's risk is the policy's insurance component.

41.     Defendant has issued numerous UNUM UL Policies to individuals and to employees of different employers with each policy issued to an individual or to an employee having a unique insurance policy number.

42.     With respect to group universal life policies, the policy itself is held in trust by a third party, sometimes known as a group universal life insurance trust (defined above as "GUL"). When an employee elects to participate in his or her employer's GUL program, Defendant issues that employee a certificate with a unique number and the employee is identified in the policy as the "Certificate Owner." The certificate issued to the Certificate Owner includes all material terms of coverage and is the document that the employee receives providing the agreed upon terms and conditions of coverage. As provided in the certificate, Defendant cannot change the certificate without the express agreement of the specific Certificate Owner.

43.     Each employee who elects to participate in a GUL insurance program selects the amount of coverage that the program makes available to the class of employee that he or she qualifies for. If the employee/Certificate Owner desires to obtain additional coverage, Defendant alone decides whether the respective employee/Certificate Owner meets Defendant's insurability requirements.

44.     Plaintiff is informed and believes, and based thereon alleges, that with respect to the group UNUM UL Policies:

> a)  the employer makes no monetary contribution to the policy premiums; instead, each owner/employee is responsible for paying his or her own premiums and resulting COI;
>
> b)  employee participation in the UNUM UL Policy is completely voluntary;
>
> c)  with respect to the UNUM UL Policy, the employer's sole functions are to permit the insurer to publicize the policy to employees, facilitate the collection of premiums—typically through automated payroll deductions, and remit them to Defendant; and
>
> d)  the employer receives no consideration in connection with the UNUM UL Policy.

45.     Plaintiff is informed and believes, and based thereon alleges, that with respect to the UNUM UL Policies, other than identifying which employees are eligible to apply for universal life coverage and setting the face amounts per class of insureds, no employer negotiated the material terms and conditions of coverage of the UNUM UL Policies. Specifically, no employer negotiated any terms related to COI or the calculation thereof. Defendant provided the material terms and conditions of coverage on a "take it or leave it" basis to employee/Certificate Owners.

46.     The employer does not determine which employees meet Defendant's requirements nor does the employer administer claims made under the UNUM UL Policy. Other than identifying the voluntary universal life insurance policy to their

employees, the employers play no role in the sale, or claims handling of the UNUM UL Policies.

<u>The Cost of Insurance Calculation under the UNUM UL Policies</u>

47.     Each of the UNUM UL Policies contain the following language:

"Risk Rate: The Table of Risk Rates, Table 1 of the Schedule, shows the guaranteed maximum monthly risk rates We can charge for the Cost of Insurance. The Insured's Age, and Class determines which guaranteed rate applies. We may charge a lower rate. **<u>We determine Our current Risk Rates based on Our expectation of future mortality</u>**. We reserve the right to change Our current rates if We expect a change in the mortality factor. Such current rates will apply to all Insureds of the same Age and Class."

\*      \*      \*      \*

"Cost of Insurance Rates. The monthly cost of insurance rate is based on the sex, attained age, and rating class of the person insured. Attained age means age last birthday on the prior policy anniversary. Monthly cost of insurance rates **<u>will be determined by us</u>** from time to time **<u>based on our expectations as to future mortality experience</u>**. However, the cost of insurance rates will not be greater than those shown in the Table of Guaranteed Maximum Insurance Rates."

*See* Exhibit A (emphasis added).

48.     Each UNUM UL Policy contains the language highlighted in bold and underlined above, and every UNUM UL Policy contains these terms, or language that is

substantially similar thereto. These policies may also be referred to herein as the "Class Policies."

49.     The relevant terms of the UNUM UL Policies are substantively identical to those set forth in Exhibit A. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The UNUM UL Policies are all contracts of adhesion but are binding contracts between UNUM and the respective group Certificate Owner or individual policyholder.

50.     The Risk Rate provision requires that Defendant must base its COI rate on, at a minimum, UNUM's "expectations of future mortality experience."

51.     The COI provision also requires that when Defendant determines the "[m]onthly cost of insurance rates" those rates "**will be determined** … **based on [UNUM's] expectations as to future mortality experience**." (Emphasis added).

52.     As a result, both the original COI rate and any subsequent changes to the COI rate must, as a matter of contract, be determined by UNUM based on Defendant's expectations of future mortality experience.

53.     The size of the COI deduction matters to Certificate Owners of UNUM UL Policies and to individual policyholders for at least two important reasons: (a) the COI deduction is typically the highest expense that a policy owner pays; and (b) the COI is deducted from the Cash Value account (*i.e.*, the savings component) of the policy, so the policy owner forfeits the COI charge entirely to Defendant, depriving the policy owner of the investment value of that money.

54.     Any references in the Class Policies to other so-called bases for establishing or adjusting COI rates are also tied directly to expectations of future

mortality experience; *i.e.*, "sex, attained age, and rating class of the person insured." The other factors are, in reality, simply different ways to describe factors used by insurers and their actuaries to determine "expectations of future mortality experience."

55.     For example, men and women have different mortality experiences, as do people of different ages and, in insurance parlance, so do individual policyholders and group Certificate Owners in different rating classes. All of these "other" factors are simply different sides of the "expectations of future mortality experience" coin.

56.     Based upon information and belief, for each of the UNUM UL Policies, Defendant adjusted the COI upward at least once. In no instance did the adjustment made by Defendant reduce the COI charged on UNUM UL Policies. It is also alleged, on information and belief, that Defendant made adjustments to the UNUM UL Policies that resulted in an increase in the COI at least once during the five years preceding the filing of this Complaint.

57.     The terms of the UNUM UL Policies are not subject to individual negotiation and are materially the same for all policyholders.

58.     Only an officer of UNUM has authority to waive or change a provision of a UNUM UL Policy and, then, only in writing.

59.     UNUM or its agents and representatives have issued and administered, and currently administers, all aspects of the UNUM UL Policies, including collecting premiums, and setting, assessing and deducting COI and other policy charges.

Improving Mortality and UNUM's Unlawful Failure to Determine and
Adjust COI Rates Based on Its Expectations of Future Mortality Experience

60.     It is a well-publicized fact that mortality rates have declined, and consequently, mortality risks for life insurers, including Defendant, have generally

decreased over time; *i.e.*, people are generally living much longer than anticipated when the products were originally priced and issued, thereby allowing life insurers to pay out death claims later than originally expected.

61.     A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect populations with different mortalities. Mortality tables will usually have separate tables for gender.

62.     Mortality tables used with individual life insurance policies additionally distinguish mortality rates for several other factors including tobacco-use status, underwriting status, reinsurance status, and duration since underwriting. Actuaries use these tables to calculate insurance rates, and are designed to reflect mortality rate experience.

63.     Beginning at least as early as 1980, the National Association of Insurance Commissioners ("NAIC") has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that were commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies (such as those here), and cover the nation based on data provided by numerous sources, including life insurance companies.

64.     The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001.

65.     In 2001, at the request of the NAIC, the Society of Actuaries and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO

Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

66.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means that the tables show a substantial improvement in mortality over a 20-year time period. These mortality improvements represent a substantial benefit that Defendant contractually was required to pass on to policy owners according to the plain language of the policies. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

67.     The Society of Actuaries is continuously investigating mortality experience and the resulting need to update the CSO tables. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further that, due to mortality improvements since 2001, there were significant reductions in insurance company reserves compared to CSO 2001.

68.     The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries. The Society of Actuaries

performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1975-1980 Basic Select and Ultimate Mortality Table;
- 1985-90 Basic Select and Ultimate Mortality Tables;
- 1990-95 Basic Select and Ultimate Mortality Tables;
- 2001 Valuation Basic Mortality Table;
- 2008 Valuation Basic Mortality Table;
- 2015 Valuation Basic Table; and
- 2018 Valuation Basic Table.

69.     The 1990-95 Basic Table reflected the death rates observed by twenty-one large life insurance companies with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint. The 2001, 2008, and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has, for the most part, continued to improve both consistently and substantially.

70.     In 2019, the Society of Actuaries published a report entitled "Mortality Improvement Scale MP-2019" which presented its "latest iteration of the mortality improvement scales developed annually by the Retirement Plans Experience Committee ... of the Society of Actuaries." At page 8, fig. 2.1 tracked graphically the age-adjusted mortality rates per 100,000 people from calendar years 1950 through 2017:

The graph depicts the mortality rate from 1980 to 2017 decreased by approximately

Figure 2.1

U.S. AGE-ADJUSTED MORTALITY RATES PER 100,000, CALENDAR YEARS 1950–2017

300 persons per 100,000.

71.     Indeed, Defendant has repeatedly acknowledged that, consistent with

industry experience, its mortality experience has been better than it expected. For

example, UNUM made the following statements in its corporate filings:

**UNUM's 2006 Annual Report**

- "Mortality is a critical factor influencing the length of time a claimant
receives long-term care benefits. Mortality continues to improve for the general
population, and life expectancy trends have extended. Changes in actual mortality
trends relative to assumptions may adversely affect our profitability."[2] Page 21.

- "The lower benefit ratio in 2005 in comparison to the prior year was
attributable to favorable claim experience in all lines of business…. Group life
reported favorable paid claim experience."  Page 68.

- "The benefit ratio for the group life line of business decreased in
comparison to 2004 due to favorable claim experience in 2005 and recent renewal

---

[2]     All underlining in the Annual Report information quoted herein was added for emphasis and does not
appear in the original filings.

activity which resulted in terminations during 2005 of less profitable business." Page 69.

- "Mortality assumptions are based upon industry standards adjusted as appropriate to reflect our actual experience." Page 109.

### UNUM's 2007 Annual Report

- "The lower benefit ratio in 2006 in comparison to 2005 was attributable to favorable claim experience in all lines of business.... Group life reported favorable paid claim experience." Page 57.

- "The benefit ratio for this segment decreased in 2007 in comparison to the prior year due primarily to favorable risk experience in the accident, sickness, and disability line of business as well as the life line of business." Page 60.

### UNUM's 2008 Annual Report

- "The benefit ratio for this segment decreased in 2007 in comparison to 2006 due primarily to favorable risk experience in the accident, sickness, and disability line of business as well as the life line of business." Page 62.

### UNUM's 2009 Annual Report

- "The benefit ratio for voluntary benefits decreased in 2008 as compared to 2007, due primarily to a lower rate of paid claim incidence for the disability line of business and a lower mortality rate for the life line of business." Page 52.

- "Mortality assumptions are based upon industry standards adjusted as appropriate to reflect our actual experience and future expectations." Page 96.

### UNUM's 2010 Annual Report

- "The life benefit ratio decreased in 2010 relative to 2009 due primarily to favorable mortality." Page 55

- "Mortality assumptions are based upon industry standards adjusted as appropriate to reflect our actual experience and future expectations. Page 96

### UNUM's 2011 Annual Report

- "Group life risk results were favorable in 2011 compared to the prior year, <u>driven by improved mortality experience</u>." Page 53.

- "Mortality assumptions are based upon industry standards adjusted as appropriate <u>to reflect our actual experience and future expectations</u>." *Id*.

- "We also changed our mortality assumptions <u>to reflect emerging experience due to an increase in life expectancies</u>…." Page 132.

### UNUM's 2012 Annual Report

- "We also changed our mortality assumptions <u>to reflect emerging experience due to an increase in life expectancies</u>…." Page 22; Page 128.

- "Group life risk results were favorable in 2011 compared to 2010 due primarily to <u>improved mortality experience</u>." Page 55.

- "Mortality assumptions are based upon industry standards adjusted as appropriate <u>to reflect our actual experience and future expectations</u>." Page 98.

### UNUM's 2013 Annual Report

- "The two fundamental assumptions in the development of the group life waiver reserve are mortality and recovery. <u>Our emerging experience and that which continues to emerge within the industry indicate an increase in life expectancies, which decreases the ultimate anticipated death benefits to be paid under the group life waiver benefit</u>. Emerging experience also reflects an improvement in claim recovery rates, which also lessens the likelihood of payment of a death benefit while the insured is disabled. <u>During the fourth quarter of 2013, we</u> completed a review of our assumptions and <u>modified our mortality and claim recovery assumptions for our UNUM US group life waiver reserves</u> and, as a result, reduced the applicable claim reserves by $85.0 million and increased net income $55.2 million." Page22; Page 132.

- "Group life risk results were favorable in 2013 compared to 2012 <u>due primarily to lower mortality rates on the retained business</u>." Page 54.

- "Mortality assumptions are based upon industry standards adjusted as appropriate to reflect our actual experience and future expectations."  Page 98.

- "We also changed our mortality assumptions to reflect emerging experience due to an increase in life expectancies…." Page 132.

**UNUM's 2014 Annual Report**

- "Our assumption update for mortality incorporates the last three years of Company-specific experience and emerging trends as well as industry data, where available and appropriate, and reflects improvements in life expectancies beyond what was initially anticipated in 2011." Page 21.

- "We updated our mortality assumptions to reflect emerging experience due to an increase in life expectancies…." *Id*.

- "The two fundamental assumptions in the development of the group life waiver reserve are mortality and recovery. Our emerging experience and that which continues to emerge within the industry indicate an increase in life expectancies, which decreases the ultimate anticipated death benefits to be paid under the group life waiver benefit. Emerging experience also reflects an improvement in claim recovery rates, which also lessens the likelihood of payment of a death benefit while the insured is disabled. During the fourth quarter of 2013, we completed a review of our assumptions and modified our mortality and claim recovery assumptions for our UNUM US group life waiver reserves and, as a result, reduced the applicable claim reserves by $85.0 million and increased net income $55.2 million." Page 22-23.

- "Mortality rate — This assumption reflects our best estimate, as of the measurement date, of the life expectancies of plan participants in order to determine the expected length of time for benefit payments. We derive our assumptions from industry mortality tables. The Society of Actuaries released updated mortality tables during the fourth quarter of 2014 which show that longevity in the United States is increasing, thereby establishing a new benchmark for mortality rates…." Page 36.

- "Group life risk results were favorable in 2013 compared to 2012 due primarily to lower mortality rates on the retained business." Page 54.

- "Mortality assumptions are based upon industry standards adjusted as appropriate to reflect our actual experience and future expectations." Page 95.

- "Our assumption update for mortality incorporates the last three years of Company-specific experience and emerging trends as well as industry data, where available and appropriate, and reflects improvements in life expectancies beyond what was initially anticipated in 2011…. Our premium rate increase assumptions were updated to reflect progress-to-date and our on-going rate increase strategy…. We updated our mortality assumptions to reflect emerging experience due to an increase in life expectancies which increases…." Page 129.

- "Our emerging experience and that which continues to emerge within the industry indicate an increase in life expectancies, which decreases the ultimate anticipated death benefits to be paid under the group life waiver benefit. Emerging experience also reflects an improvement in claim recovery rates, which also lessens the likelihood of payment of a death benefit while the insured is disabled. During 2013, we completed a review of our assumptions and modified our mortality and claim recovery assumptions for our UNUM US group life waiver reserves and, as a result, reduced claim reserves by $85.0 million. Of this amount, approximately $78.0 million was attributed to prior year incurred claims, thereby impacting the results shown in the preceding chart." Page 130.

- "Our mortality rate assumption reflects our best estimate, as of the measurement date, of the life expectancies of plan participants in order to determine the expected length of time for benefit payments. We derive our assumptions from industry mortality tables. The Society of Actuaries released updated mortality tables during the fourth quarter of 2014 which show that longevity in the United States is increasing…. Our mortality assumptions for our U.S. plans reflect the updated mortality tables." Page 145.

### UNUM's 2015 Annual Report

- "Our assumption update for mortality incorporated the last three years of Company-specific experience and emerging trends as well as industry data, where available and appropriate, and reflected improvements in life expectancies beyond what was initially anticipated in 2011…. Our premium rate increase assumptions were updated to reflect progress-to-date and our on-going rate increase strategy." Page 21.

- "The two fundamental assumptions in the development of the group life waiver reserve are <u>mortality</u> and recovery. <u>Our emerging experience and that which continues to emerge within the industry indicate an increase in life expectancies, which decreases the ultimate anticipated death benefits to be paid under the group life waiver benefit. Emerging experience also reflects an improvement in claim recovery rates, which also lessens the likelihood of payment of a death benefit while the insured is disabled.</u> UNUM  2015 Annual Report 23 During the fourth quarter of 2013, we completed a review of our assumptions and <u>modified our mortality and claim recovery assumptions for our UNUM  US group life waiver reserves</u> and, as a result, reduced the applicable claim reserves by $85.0 million and increased 2013 net income $55.2 million." Page 22-23; Page 131.

- "During 2015, claim resolution rates pertaining to life expectancy exhibited an increase in the number of deaths, although <u>overall mortality experience in 2015 was relatively consistent with the levels of 2014 and 2013</u>. On an annual basis for the years 2013 to 2015, <u>our overall claim resolution rates were fairly consistent with or slightly favorable to our long-term assumptions</u>." Page 30.

- "<u>Mortality rate — This assumption reflects our best estimate, as of the measurement date, of the life expectancies of plan participants in order to determine the expected length of time for benefit payments. We derive our assumptions from industry mortality tables</u>." Page 36.

- "The favorable group life experience was <u>due to a lower claim incidence rate and a lower average claim size</u>." Page 54.

- "Mortality assumptions are based upon industry standards adjusted as appropriate <u>to reflect our actual experience and future expectations</u>." Page 94.

- "<u>Our assumption update for mortality incorporated the last three years of Company-specific experience and emerging trends as well as industry data, where available and appropriate, and reflected improvements in life expectancies beyond what was initially anticipated in 2011</u>…. <u>Our premium rate increase assumptions were updated to reflect progress-to-date and our on-going rate increase strategy</u>." Page 131.

- "We <u>updated our mortality assumptions to reflect emerging experience due to an increase in life expectancies</u>…." *Id.*

- "<u>Our mortality rate assumption reflects our best estimate, as of the measurement date, of the life expectancies of plan participants</u>…." *Id*.

72.     During the Class period, Defendant made numerous adjustments to the COI of the UNUM UL Policies held by Plaintiff and members of the proposed class. Despite the trend of improving rates of mortality, and the requirement that Defendant must determine and base its COI rates on its expectations of future mortality experience which would mandate reductions in COI rates, Defendant has only increased COI rates on the UNUM UL Policies.

73.     Defendant has breached its contracts with Plaintiff and the proposed class by increasing the COI charges because it did not base its adjustments on its expectations as to future mortality experience. Had Defendant based its adjustments on its expectations as to future mortality experience, as required by the contract, the COI rates should have decreased but, instead, Defendant increased the COI charges for its own financial gain and in breach of the UNUM UL Policies.

74.     In addition to a death benefit, the UNUM UL Policies include an investment, savings, or interest-bearing component that accumulates value over time. Although the savings component in UNUM UL Policies may be identified by a different name, it is identified in the Exemplar UNUM UL Policy and throughout this Complaint as the "Cash Value."

75.     Generally, like Plaintiff and class members, universal life insurance policyholders contribute premiums, the net amount of which, after a "Premium Deduction" charge is deducted, are deposited into the cash value of a policy, from which the insurer deducts monthly charges as authorized by the policy.

76.     As set out above, the UNUM UL Policies expressly define the specific charges that UNUM may assess and deduct from Plaintiff's Cash Value. UNUM may assess and deduct only those charges allowed by the UNUM UL Policies.

77.     Under the explicit terms of the UNUM UL Policies, UNUM is authorized to use only the insured's age, sex, and rate class—in other words its expectations as to future mortality experience—when determining the cost of insurance rates for the UNUM UL Policies.

78.     Age, sex, and rate class are factors commonly used within the life insurance industry to determine the future mortality expectations of an insured or group or class of insureds.

79.     Because the Policy specifically identifies age, sex, and rate class among the factors that make up UNUM's expectations as to future mortality experience, the parties to the insurance contract agreed that mortality expectations are what determine cost of insurance rates under the UNUM UL Policies.

80.     The UNUM UL Policies disclose similar periodic deductions that Defendant is authorized to take from policyholders' Cash Values, including specifically, COI that are calculated using rates that Defendant must determine based on its expectation as to future mortality experience, and separate maintenance, administrative, or other expense charges or deductions in fixed amounts.

81.     Although the UNUM UL Policies allow UNUM to use only its "expectations as to future mortality experience" when determining and adjusting COI rates, UNUM failed to abide by the express provisions of the UNUM UL Policies.

82.     The higher COI rates used by UNUM caused the monthly COI deduction to be greater than what is explicitly authorized by individual owners and the Certificate Owners of the UNUM UL Policies. Consequently, UNUM withdraws from the Cash Value an amount for the COI that is greater than that authorized under the UNUM UL Policies.

83.     Each of UNUM's past and future COI deductions from the Cash Values of UNUM UL Policies constitutes a separate and ongoing breach of contract.

84.     Therefore, as a direct and proximate result of UNUM's wrongful policy breaches, Plaintiff and members of the proposed class have been damaged, and those damages are continuing in nature in that UNUM has deducted and will continue to deduct unauthorized COI from the Cash Values maintained by group Certificate Owners and individual policyholders of the UNUM UL Policies.

85.     The nature of UNUM's conduct is such that Plaintiff, and each member of the proposed class, would be unaware that Defendant was engaging in wrongdoing by taking inflated charges and improper amounts from cash values. UNUM possesses the actuarial information and equations underlying the computation of rates and charges for the Policy.

86.     The nature of UNUM's conduct is such that Plaintiff, and each member of the proposed class, would be unaware that Defendant was engaging in wrongdoing by taking inflated charges and improper amounts from Cash Values. UNUM possesses the actuarial information and equations underlying the computation of rates and charges for the maintained by group Certificate Owners and individual policyholders of the UNUM UL Policies.

87.     The rates used to determine the COI are not disclosed to group Certificate Owners and individual policyholders of the UNUM UL Policies nor are the components or factors that comprise those rates. And, even if they were, Plaintiff and the members of the proposed class would lack the knowledge, experience, or training to reasonably ascertain the methodology by which UNUM calculated those rates and charges.

88.     Because of its superior knowledge of the aforementioned computations, UNUM was aware that Plaintiff and each member of the proposed lass did not know about the improper deductions. UNUM sent Plaintiff and the proposed class annual statements each year that identified each month's COI deduction while affirmatively concealing the factors Defendant used to calculate the COI. Concealment of its conduct and failure to disclose its conduct to Plaintiff and the members of the proposed class constitutes fraudulent concealment and therefore tolls the statute of limitations for Plaintiff and members of the proposed class.

89.     Neither Plaintiff nor members of the proposed class discovered, nor could they have, through reasonable diligence, discovered the facts establishing UNUM's breaches or the harm caused thereby.

## CLASS ACTION ALLEGATIONS

90.     This action is brought by Plaintiff individually and on behalf of the following Class pursuant to Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. The Class consists of:

> "All persons who own or owned a universal life insurance policy
> issued or administered by Defendant, the terms of which provide or
> provided for:

(1) an insurance or cost of insurance charge or deduction

calculated using a rate that is determined based on Defendant's

expectations as to future mortality experience;

(2) additional but separate policy charges, deductions, or

expenses;

(3) an investment, interest-bearing, or savings component; and

(4) a death benefit."

91.     Excluded from the class is Defendant, any entity in which Defendant has a controlling interest, any of the officers, directors, or employees of Defendant, the legal representatives, heirs, successors, and assigns of Defendant, anyone employed with Plaintiff's counsels' firms, any Judge to whom this case is assigned, and his or her immediate family.

92.     The proposed class members consist of hundreds or possibly thousands of consumers of UNUM UL Policies and are thus so numerous that joinder of all members is impracticable. The identities and addresses of proposed class members can be readily ascertained from business records maintained by Defendant.

93.     Plaintiffs' claims satisfy the numerosity, typicality, adequacy, commonality, and superiority requirements under Federal Rule of Civil Procedure 23, as set forth more fully herein.

94.     The persons who fall within the proposed class number in at least the hundreds and most likely thousands, and thus the numerosity standard is satisfied. Because proposed class members are geographically dispersed across the country, joinder of all proposed class members in a single action is impracticable.

95.     The claims asserted by Plaintiff are typical of the claims of the proposed class.

96.     Plaintiff will fairly and adequately protect the interests of the proposed class and does not have any interests antagonistic to those of the other members of the proposed class.

97.     Plaintiff has retained attorneys who are knowledgeable and experienced in group life insurance matters and COI matters, as well as class and complex litigation.

98.     Plaintiff requests that the Court afford proposed class members with notice and the right to opt-out of any class certified in this action.

99.     Proposed class members are readily ascertainable from information and records in Defendant's possession, custody, or control. Notice of this action can readily be provided to members of the proposed class.

100.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the Class predominate over any individualized issues. Those common questions that predominate include:

(a)     The construction and interpretation of the UNUM UL Policies at issue in this litigation;

(b)     Whether Defendant is permitted by the UNUM UL Policies to use factors other than those disclosed in the UNUM UL Policies to determine the monthly cost of insurance rates used to calculate insurance policy deductions;

(c)    Whether Defendant added, included, or relied on factors not specified in the UNUM UL Policies when determining the monthly cost of insurance rates used to calculate cost of insurance charges or deductions;

(d)    Whether Defendant added, included, or relied on factors unrelated to mortality expectations in setting and determining cost of insurance rates, despite the policy provisions providing that cost of insurance rates **will be based** on expectation as to future mortality experience;

(e)    Whether Defendant based its COI charges on its expected mortality experience;

(f)    Whether Defendant considered its expected future mortality experience at all when increasing COI;

(g)    Whether Defendant breached the terms of the UNUM UL Policies;

(h)    Whether Defendant's actions in not decreasing and then increasing the COI when making  adjustments thereto violated the terms of those UNUM UL Policies;

(i)    Whether the class sustained damages as a result of Defendant's breaches of contract;

(j)    Whether the class is entitled to damages, restitution, and/or other equitable relief requiring Defendant to make deductions from cash values in accordance with the terms of the UNUM UL Policies in the future;

(k)    Whether Defendant has experienced better mortality than it expected on each determination of COI; and

(l)     Whether the class is entitled to declaratory relief stating the proper construction and/or interpretation of the Class Policies.

101.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     The complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     When Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

(c)     This action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

(d)     Without a class action, many class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)     This action does not present any undue difficulties that would impede its management by the Court as a class action.

102.   This action is appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because by failing to base its COI adjustments on its

future mortality experience, Defendant has acted or refused to act on grounds that apply generally to the Class.

103.    Declaratory and attendant injunctive relief is warranted to compel UNUM to comply in the future with its mandatory contractual obligations under the UNUM UL Policies.

104.    Defendant continues to breach its UNUM UL Policies with Plaintiff and the Class members on an annual basis, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards Class members, and making final injunctive relief appropriate respecting members of the proposed class as a whole.

105.    Although requiring expert testimony, the amounts of unauthorized cost of insurance charges and expense charges Defendant took from Plaintiff and members of the proposed class are capable of determination, to an identified sum, by comparing Plaintiff's actual cost of insurance charge each month to a cost of insurance charge computed using a monthly cost of insurance rate determined using Defendant's expectations as to future mortality experience.

106.    Plaintiff and the proposed class members have performed all of their obligations under the UNUM UL Policies, except to the extent that their obligations have been excused by Defendant's conduct as set forth herein. Thus, all conditions precedent under the UNUM UL Policies have been satisfied or waived.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

107.    Paragraphs 1-106, above, are incorporated by reference as if fully alleged herein. This claim is brought on behalf of Plaintiff and members of the proposed class.

108.    The UNUM UL Policies are binding and enforceable contracts.

109.    Defendant breached the UNUM UL Policies/contracts by:

(a)  Increasing the COI when it adjusted the amount to be charged to the policyholders because its expectations of future mortality experience did not support an increase in the COI;

(b)  Failing to reduce the COI when it adjusted the amount to be charged to the policyholders because Defendant's expectations of future mortality experience supported a decrease in the COI;

(c)   Not reducing the COI deduction at all and leaving the COI deductions the same when Defendant's expectations of future mortality experience supported a decrease.

(d)  Not considering any of its expectations of future mortality experience when determining the amount of COI to deduct from Cash Value when it adjusted the amount charged on UNUM UL Policies;

(e)  Improperly reducing the Cash Value of policyholder cash accounts by deducting COI that was calculated in violation of the terms of the UNUM UL Policies; and

(f)  Depriving Plaintiff and the proposed class members of the investment value of the monies improperly deducted from Cash Value.

110.    Plaintiff and the proposed class members have performed all of their obligations under the UNUM UL Policies, except to the extent that their obligations have been excused by Defendant's conduct as set forth herein.

111.    As a direct and proximate cause of Defendant's material breaches of the policies, Plaintiff and the proposed members of the class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing

112.    Paragraphs 1 to 106, above, are incorporated by reference as if fully alleged herein. This claim is brought on behalf of Plaintiff and members of the proposed class.

113.    The UNUM UL Policies are binding and enforceable contracts. Plaintiff is the rightful Certificate Owner/assignee of the Exemplar UNUM UL Policy and therefore enjoys all the benefits and has undertaken the obligations under the Exemplar UNUM UL Policy. Members of the proposed class are also rightful owners of UNUM UL Policies and therefore enjoy all the benefits and have undertaken the obligations under the UNUM UL Policies.

114.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance and limits a party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

115.    Each member of the proposed class purchased a UNUM UL Policy from Defendant or acquired a UNUM UL Policy issued by Defendant.

116.    Plaintiff and members of the proposed class have performed all of their obligations under the Exemplar UNUM UL Policy and the other UNUM UL Policies,

except to the extent that their obligations have been excused by Defendant's conduct as set forth herein.

117.    Where an agreement affords one party the power to act, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

118.    Plaintiff and members of the proposed class had the reasonable expectation, based upon the terms of the UNUM UL Policies, that if Defendant had the discretion to base the COI rates on more than just its future mortality experience (which it is alleged Defendant did not possess), Defendant would primarily base—or at least consider—the expectations of future mortality experience when making its COI adjustments.

119.    Defendant's actions breached the implied covenant of good faith and fair dealing in the UNUM UL Policies by:

(a)  Increasing the COI charges when it adjusted the amount to be charged to the group Certificate Owners and individual policyholders because its expectations of future mortality experience did not support an increase in the COI;

(b)  Failing to reduce the COI charges when it adjusted the amount to be charged to the group Certificate Owners and individual policyholders because Defendant's expectations of future mortality experience supported a decrease in the COI;

(c)  Not reducing the COI deduction and leaving the COI deductions the same when Defendant's expectations of future mortality experience supported a decrease;

(d)  Taking factors other than its expectations of future mortality experience into account when determining the amount of COI to charge when it adjusted the amount charged on UNUM UL Policies;

(e)  Alternatively, not relying principally on its expectations of future mortality experience when determining the amount of COI to charge when it adjusted the amount charged on UNUM UL Policies;

(f)  Not considering any of its expectations of future mortality experience when determining the amount of COI to charge when it adjusted the amount charged on UNUM UL Policies; and

(g)  Improperly reducing the Cash Value of policyholder cash accounts by deducting COI amounts that were calculated in violation of the terms of the UNUM UL Policies.

120.    Defendant's conduct was solely for its own benefit and did not comport with the reasonable contractual expectations of Plaintiff and members of the proposed class by failing to determine the Monthly Cost of Insurance Rates solely based on its expectations as to future mortality experience.

121.    As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff and members of the proposed class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### Conversion

122.    Paragraphs 1 to 106, above, are incorporated by reference as if fully alleged herein. This claim is brought on behalf of Plaintiff and members of the proposed class.

123.    Plaintiff and members of the proposed class had a property interest in the funds Defendant deducted from their Cash Values in excess of the amounts permitted by the terms of the UNUM UL Policies.

124.    By deducting cost of insurance charges and expense charges in unauthorized amounts from the Cash Values of Plaintiff and members of the proposed class, Defendant assumed and exercised ownership over, and misappropriated or misapplied, specific funds held in trust for the benefit of Plaintiff and members of the proposed class without authorization or consent and in hostility to the rights of Plaintiff and members of the proposed class.

125.    Defendant continues to retain these funds unlawfully without the consent of Plaintiff or members of the proposed class.

126.    Defendant's wrongful exercise of control over the personal property of Plaintiff and members of the proposed class constitutes conversion.

127.    As a direct and proximate result of Defendant's conduct, Plaintiff and members of the proposed class have been damaged, and these damages are continuing in nature.

128.    On behalf of itself and members of the proposed class, Plaintiff seeks all damages and consequential damages proximately caused by Defendant's conduct.

129.    Defendant intended to cause damage to Plaintiff and the class by deducting more from their cash value than was authorized by the UNUM UL Policies. Defendant's

conduct was, therefore, malicious and Defendant is also guilty of oppression in that its systematic acts of conversion subject Plaintiff and members of the proposed class to cruel and unjust hardship in conscious disregard of their rights. Plaintiff and members of the proposed class are therefore entitled to punitive or exemplary damages.

### FOURTH CLAIM FOR RELIEF

### Declaratory and Injunctive Relief – 28 U.S.C.A. § 2201

130.   Paragraphs 1 to 106, above, are incorporated by reference as if fully alleged herein. This claim is brought on behalf of Plaintiff and members of the proposed class.

131.   An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other, concerning the respective rights and duties of the parties under the UNUM UL Policies.

132.   As set forth more fully above, Plaintiff contends that Defendant has breached the UNUM UL Policies in the following respects, among others:

(a)   By using unauthorized and undisclosed factors to compute the monthly cost of insurance rates under the UNUM UL Policies, Defendant impermissibly increased monthly cost of insurance rates for the UNUM UL Policies and, as a result, withdrew cost of insurance charges from the Cash Values of Plaintiff and the class in an amount greater than those authorized by the UNUM UL Policies;

(b)   By inflating monthly cost of insurance rates with unauthorized expense factors, including without limitation, maintenance and administrative expense factors, Defendant impermissibly deducted expenses from the Cash

Values of Plaintiff and the class in amounts in excess of the fixed, maximum maintenance charges and administrative charges expressly authorized by the UNUM UL Policies; and

    (c)    By failing to reduce cost of insurance rates to reflect Defendant's improving expectations as to future mortality experience.

133.    Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the UNUM UL Policies and requests the Court to declare the aforementioned conduct of Defendant as unlawful and in material breach of the UNUM UL Policies so that future controversies may be avoided.

134.    Pursuant to a declaration of the parties' respective rights and duties under the UNUM UL Policies, Plaintiff further seeks an injunction temporarily, preliminarily, and permanently enjoining Defendant (1) from continuing to engage in conduct in breach of the UNUM UL Policies, and from continuing to collect unlawfully inflated charges in violation of the UNUM UL Policies; and (2) ordering Defendant to comply with terms of the UNUM UL Policies in regards to its assessment of charges against the Cash Values of Plaintiff and members of the proposed class.

## **ATTORNEY'S FEES**

135.    Plaintiff has engaged the law firm of Greenspoon Marder LLP to pursue these class action claims on behalf of the Plaintiff and the proposed class. To the fullest extent permitted under the law and in equity, Plaintiff therefore requests that the Court award Plaintiff and the proposed class their reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the proposed class pray for judgment as follows:

1.      That the Court enter an order certifying the class, appointing Plaintiff as a representative of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

2.      For a judgment against Defendant for each of the Claims for Relief alleged against it;

3.      Awarding Plaintiff and members of the proposed class compensatory damages in an amount to be proven at trial;

4.      Awarding Plaintiff and members of the proposed class pre-judgment and post-judgment interest, as well as attorneys' fees and costs;

5.      For appropriate injunctive relief, enjoining Defendant from basing adjustments to the COI rate for UNUM UL Policies on factors other than its future mortality experience or, alternatively, enjoining Defendant from failing to use its future mortality experience as the principal basis for adjustments to its COI rates on UNUM UL Policies;

6.      For pre-judgment and post-judgment interest at the maximum rate permitted by law;

7.      For punitive and exemplary damages;

8.      For the costs incurred by Plaintiff and members of the proposed class; and

9.      For such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and members of the proposed class demand a jury trial on all issues so triable.


Dated:  December 29, 2022                    Respectfully submitted,

                                             By: /s/  Julie M. Moeller
                                             Julie M. Moeller
                                             Attorney-in-Charge
                                             Texas State Bar No.: 24073830
                                             SDTX Bar No.: 1128602
                                             julie.moeller@gmlaw.com
                                             GREENSPOON MARDER LLP
                                             700 Milam Street, Suite 1300
                                             Houston, TX 77002
                                             Telephone: (212) 524-4966
                                             Facsimile: (954) 771-9264

OF COUNSEL:

Richard C. Giller
(*pro hac vice forthcoming*)
California State Bar No. 117823
richard.giller@gmlaw.com
GREENSPOON MARDER LLP
1875 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (323) 880-4520
Facsimile: (954) 771-9264

EXHIBIT A

CERTIFICATE COVERAGE VERIFICATIONS                    ABS34

GROUP POLICYHOLDER:   TOSHIBA INTERNATIONAL

                                    GROUP NUMBER:  830
                                    POLICY ANNIVERSARY DATE: JANUARY 01


OWNER:    ROSSIN & CO KAUFMAN        CERTIFICATE NUMBER: 2208709
          C/O PAGE AND ASSOC         OWNER NUMBER: 465089457
          MIAMI FL 33133             ORIGINAL EFFECTIVE DATE:  12/01/92
                                     CURRENT EFFECTIVE DATE:   12/01/92


EMPLOYEE AGE: 43 *                   SPOUSE AGE: 42 *
*(AS OF POLICY ANNIVERSARY DATE)

EMPLOYEE COVERAGE AMOUNT:      $90,000

SPOUSE  COVERAGE AMOUNT:       $45,000

CHILD(REN) COVERAGE: NOT INCLUDED


CERTIFICATE MATURITY DATE: THE POLICY ANNIVERSARY DATE FOLLOWING THE INSURED'S
                           95TH BIRTHDAY. THE CERTIFICATE WILL TERMINATE PRIOR
                           TO THIS DATE IF THE CONTRIBUTIONS PAID ARE NOT
                           SUFFICIENT TO CONTINUE THIS CERTIFICATE IN FORCE TO
                           THIS DATE. ADDITIONAL COVERAGES MAY TERMINATE AT AN
                           EARLIER DATE. PLEASE REFER TO YOUR CERTIFICATE OF
                           INSURANCE.


GUARANTEED MINIMUM INTEREST RATE: 4%*
*(IF PARTICIPATING IN THE CASH ACCUMULATION OPTION)



WAIVER OF PREMIUM OPTION: YES

MINIMUM LOAN/WITHDRAWAL AMOUNT: $500.00*
*(IF PARTICIPATING IN THE CASH ACCUMULATION OPTION)

MINIMUM CONTRIBUTION: NONE


COMPANY: UNUM LIFE INSURANCE COMPANY OF AMERICA


THIS CERTIFICATE COVERAGE VERIFICATION PAGE IS TO BE ATTACHED TO YOUR CERTIFICATE OF
INSURANCE AND REPLACES PREVIOUSLY ISSUED COVERAGE VERIFICATION PAGES, IF ANY.

JV100Z



UNUM.

a division of Seabury & Smith, Inc.

1776 West Lakes Parkway
West Des Moines, IA 50398

Dear Insured:

Enclosed is a new Group Universal Life Certificate Schedule Page reflecting your current coverage(s).  This Schedule replaces all previously issued pages and should be placed with your certificate of insurance.

If you have any questions, call us toll free at the number listed in your brochure.  A Customer Service Representative will be available to assist you.

The Customer Service Representatives
KVI, a division of Seabury & Smith, Inc.
Plan Administrators

Enclosure

UNUM LIFE INSURANCE COMPANY OF AMERICA
GROUP REFERENCE NUMBER: 830
STATEMENT OF ACCOUNT

CERTIFICATE OWNER:                              OWNER NUMBER: 465089457
DE AINZA, CHARLES

HOUSTON          TX 77042

|  | EMPLOYEE | SPOUSE |
|---|---|---|
|  | AS OF 11/30/97 | AS OF 11/30/97 |
| ORIGINAL EFFECTIVE DATE | 12/01/92 | |
| CERTIFICATE NUMBER | 2208709 | |
| SPECIFIED AMOUNT OF LIFE INSURANCE | 90,000.00 | 45,000.00 |
| CASH ACCUMULATION VALUE | 33.59 | 1.16 |
| TOTAL DEATH BENEFIT | 90,033.59 | 45,001.16 |

MONTHLY SUMMARY

| | | |
|---|---|---|
| SPECIFIED AMOUNT OF LIFE INSURANCE COST | 13.32 | 6.66 |
| ADMINISTRATIVE COST | 0.00 | 0.00 |
| CASH ACCUMULATION CONTRIBUTION | 0.00 | 0.00 |
| TOTAL MONTHLY PREMIUM | 13.32 | 6.66 |
| CERTIFICATE LOAN ACTIVITY | NONE | NONE |

STATEMENT PERIOD SUMMARY

| | | |
|---|---|---|
| BEGINNING CASH VALUE | 0.00 | 0.00 |
| CONTRIBUTIONS RECEIVED* | 100.08 | 79.92 |
| 1035 EXCHANGE | 89.52 | N/A |
| SPECIFIED AMOUNT OF LIFE INSURANCE COST | 159.84- | 79.92- |
| ADMINISTRATIVE COST | 0.00 | 0.00 |
| INTEREST CREDITED | 3.83 | 1.16 |
| ENDING CASH VALUE | 33.59 | 1.16 |

* CONTRIBUTIONS RECEIVED DURING STATEMENT PERIOD INCLUDE PAYMENTS
  RECEIVED FROM 12/01/96 TO 11/30/97.

THE GROUP UNIVERSAL LIFE PROGRAM IS OFFERED AND ADMINISTERED BY JOHNSON &
HIGGINS/KIRKE-VAN ORSDEL, INC., AND UNDERWRITTEN BY UNUM LIFE INSURANCE COMPANY
OF AMERICA.  FOR UPDATED ACCOUNT INFORMATION, PLEASE CALL TOLL-FREE
1-800-557-0739.

UNUM LIFE
Statement of Account for the Employees of Toshiba International
Group Universal Life Insurance

Insured                                CHARLES DE AINZA
Date of Birth                          ████/57
Policy Number                          ████████
Policy Anniversary Date                JANUARY 1st
Certificate Number                     2208709
Original Effective Date                12/01/92
Certificate Owner                      CHARLES DE AINZA
Certificate Owner's Address            ████████████

                                       HOUSTON, TX 77042
Owner Number                           ████████

Coverage Information as of 06/01/99:
    Life Insurance Face Amount                 $90,000
        Amount of Last Increase/Date           $0.00
    Accidental Death Benefit                   N/A
    Children's Insurance Rider                 N/A

Any cash value at the time of death will be added to the Basic Life Insurance amount for the Total Death Benefit.

Account Values as of 06/01/99:
    Cash Value                                 $0
    Outstanding Policy Loan                    $0

Cash Value Information is net of outstanding policy loans.

Premium Information as of 06/01/99:
    Current Premium                            $53.73
    Premium Mode                               QUARTERLY
    Paid to Date                               06/01/99

Please note that this information is accurate to the best of our knowledge, but if different from the terms of the certificate, the certificate shall prevail. The death benefit amount may include an automatic increase based on salary, but requires the insured to be actively at work at the time the increase is effective. This provision, incontestable periods, suicide clauses, and other contractual provisions that might affect the death benefit amount are described in the certificate of insurance, which is provided to each insured. The certificate of insurance should be thoroughly reviewed for a complete understanding of this coverage.

* Information provided by KVI, a division of Seabury & Smith

Prepared by: ALLISON GRUETZMACHER

JUNE 25, 1999

AGP/ab

# UNUM LIFE INSURANCE COMPANY OF AMERICA

A Stock Insurance Company

2211 Congress Street, Portland, Maine 04122

## CERTIFICATE OF INSURANCE

We have issued a Group Policy to the Policyholder named in the Schedule. The Group Policy is the only contract under which benefit payments are made. This Certificate describes the main features of the Group Policy.

This Certificate replaces any certificate previously issued to You under the Group Policy. The Schedule specifies the insurance benefits to which You are entitled.

### READ YOUR CERTIFICATE CAREFULLY.

Signed for the UNUM LIFE INSURANCE COMPANY OF AMERICA.

Secretary                                        President

Countersigned _____

GROUP FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE
DEATH BENEFIT PAYABLE UPON DEATH PRIOR TO MATURITY DATE
SURRENDER VALUE, IF ANY, PAYABLE ON MATURITY DATE
ADJUSTABLE DEATH BENEFIT
FLEXIBLE PREMIUMS PAYABLE DURING INSURED'S LIFETIME TO MATURITY DATE

NON-PARTICIPATING

 UNUM.

LH 11160

## GUIDE TO CONTENTS

SCHEDULES ................................................ Attached
DEFINITIONS ................................................ p. 2
GENERAL PROVISIONS ............................... p. 2-3
OWNERSHIP AND BENEFICIARY
 ·PROVISIONS ............................................ p. 3-4
PREMIUM AND REINSTATEMENT ..............
 PROVISIONS ........................................... p. 4-5
CASH VALUE PROVISIONS ......................... p. 6

INSURANCE COVERAGE PROVISIONS ..... p. 6-7
LOAN PROVISIONS...................................... p. 8
SURRENDER PROVISIONS ......................... p. 8
WITHDRAWAL PROVISIONS ....................... p. 9
CONTINUATION OF GROUP POLICY
 BENEFITS PROVISION ............................ p. 9
EXCHANGE PRIVILEGE PROVISION .......... p. 9-1 0
PAYMENT OPTION PROVISIONS ............... p. 10-12

A copy of Your application and any rider(s) are attached.

# DEFINITIONS

We define here some of the words used in this Certificate. We explain others, not defined here, in other parts of the text.

a. **Age:** For each insured person, Age is such person's age last birthday on the most recent Policy Anniversary Date, or Policy Date, as appropriate.

b. **Certificate Date:** The date insurance for an Insured becomes effective is shown in the Schedule. The first certificate year starts on the Certificate Date. Certificate years after the first start on the same date in each later year. A Certificate Anniversary is a yearly anniversary of the Certificate Date.

c. **Employer:** The Employer is the Policyholder named in the Schedule.

d. **Employer Group:** A group of persons who are Insureds because they are: 1) employed by the Employer; or 2) dependents of an employee of the Employer.

e. **Insured:** The person named in the Schedule for whom the required premium has been paid.

f. **Maturity Date:** The date on which the Insured attains Age 95. This date is shown in the Schedule.

g. **Policy Monthly Anniversary Date:** The same day of each calendar month as the Policy Date in each later month.

h. **Policy Month:** The first Policy Month is the period from the Policy Date to the first Policy Monthly Anniversary Date. Each succeeding Policy Month is the period from one Policy Monthly Anniversary Date up to, and including, the next Policy Monthly Anniversary Date.

i. **We, Our, Us:** UNUM LIFE INSURANCE COMPANY OF AMERICA.

j. **You, Your:** The person who owns the rights and privileges described in this Certificate with respect to the insurance on an Insured. On a Certificate Date, You are an eligible employee of the Employer: 1) to whom insurance under the Group Policy is made available; and 2) pays premiums. On any date after the Certificate Date, You are such eligible employee unless ownership is transferred as described in this Certificate. If ownership is transferred, "You" means the new owner.

# GENERAL PROVISIONS

**Clerical Error**
Clerical error on the part of the Policyholder will not void insurance which would otherwise be in force nor continue insurance which would otherwise have terminated.

**Inspection**
The Group Policy and the Policyholder's application shall be available for inspection by You, a Beneficiary, or an authorized representative. Such persons may inspect these forms during the regular business hours of the Policyholder, or at some other reasonably accessible place.

**The Contract**
The Group Policy, the Policyholder's application, and any attached Riders form the entire contract. A copy of the Policyholder's application is attached. All statements made in the Policyholder's application and in Your applications are deemed representations and not warranties.

**Contract Changes**
No agent may make any changes in the contract. Only Our President, a Vice President or a Secretary may change or waive any provision of the contract. Any such change(s) or waiver must be: a) signed and accepted by the Policyholder; and b) in writing and attached to the Group Policy.

**Incontestability**
We will not contest the validity of the Group Policy after it has been in force for two years from the Policy Date except for non-remittance of premium.

We may not contest the insurance of an Insured after it has been in force during such Insured's lifetime for two years from the Certificate Date except: a) for non-payment of premium; or b) in case of reinstatement; or c) in case of increases in the Specified Amount.

We may not contest an increase in the Specified Amount after it has been in force during the Insured's lifetime for two years from the date the increase takes effect except for nonpayment of premium. Only statements made in the supplemental application for such increase may be used to contest an increase.

No statement made by You or the Insured relating to the Insured's insurability may be used in a contest or to reduce benefits unless: a) it is contained in a written instrument signed by You or the Insured; and b) a copy of such instrument has been given to You, the insured, or his or her Beneficiary or personal representative.

**Suicide**
If an Insured commits suicide while sane or insane within two years from the Certificate Date and while the insurance is in force, the amount We pay will be limited to: a) all premium(s) paid; less b) any loan against the insurance; less c) any amount paid as a Withdrawal.

If an Insured commits suicide while sane or insane within two years from the date an increase in the Specified Amount takes effect, the amount We pay with respect to the increase will be limited to the Cost of Insurance for such increase.

(LH 11160-2)

## GENERAL PROVISIONS (cont.)

### Misstatement of Age
If the stated age of the Insured is not correct, We will adjust the Death Benefit to that which would have been purchased by the most recent Risk Rates charge for the true age.

### Currency
Any money We pay, or which is paid to Us, must be in United States currency.

### Non-Participating
The Group Policy and this Certificate do not share in any distribution of Our surplus. We do not pay dividends on the Group Policy or this Certificate.

### New Entrants
Persons who become members of the class or classes of persons eligible for insurance after the Policy Date may elect to be added to the class or classes for which they are newly eligible. Insurance will be effective for such new entrants on the Policy Monthly Anniversary Date on or next following the date such election is made if We have received the necessary premium.

### Certificates
We issued this Certificate to be delivered to You. This Certificate specifies: the Certificate Date; benefit amounts; the main terms of insurance; and to whom benefits are payable as of the Certificate Date. The Certificate Date coincides with a Policy Monthly Anniversary Date.

We will issue a new Schedule to show certain change in benefits or amounts which We approve after the Certificate Date. Any new Schedule will replace all Schedules previously issued to You.

### Cancellation of Group Policy
If the Group Policy is cancelled while this Certificate is in force, You may thereafter remit premium directly to Us. Insurance with respect to the Insured may continue in accordance with the Continuation of Group Policy Benefits section.

## OWNERSHIP AND BENEFICIARY PROVISION

### Ownership and Control
You are the owner of the rights and privileges described in this Certificate. While the Insured is living You are entitled to: a) receive any certificate benefit and value; and b) exercise any right or privilege in this Certificate.

### Transfer of Ownership
You may request a transfer of ownership while this Certificate is in force. The request must be in writing and on a form which meets Our needs. The transfer shall take effect as of the date it was signed, subject to Our receipt of the request. We will acknowledge the request and return a copy of it to You. No change of ownership shall bind Us in any way until it is received and processed at Our Office. The new owner will enjoy the same benefits, rights and privileges as the previous owner, subject to the interest of an existing assignee or irrevocable Beneficiary.

### Assignment
You may assign the benefits, rights and privileges which are described in this Certificate to others. For Us to honor an assignment, it must be in writing, and filed at Our Office while this Certificate is in force.

No assignment shall bind Us in any way until it is received and processed by Us. We are not responsible for the validity or effect of the assignment.

### Beneficiary
A Beneficiary may be named by You in Your application. The Death Benefit with respect to the Insured will be paid to the Beneficiary of record, if living, upon the death of the Insured. If there is no Beneficiary or if the named Beneficiary is not alive, We will pay You, unless You have stated otherwise. The payment of the Death Benefit will be subject to any assignment, and the provisions described in this Certificate.

Any amount to be paid to two or more persons shall be paid in equal shares, unless the beneficiary designation states otherwise. Any designation of children will be assumed to mean lawful children of the Insured by birth or adoption, unless You have stated otherwise.

If the Beneficiary dies simultaneously with the Insured, the benefit will be paid as if the Beneficiary died before the Insured. This will not be the case if: a) We paid a benefit before We received notice of the Beneficiary's death; or b) You have stated otherwise.

### Change of Beneficiary
The Beneficiary is revocably named. This allows You to name or change the Beneficiary while the insurance is in force. You may ask that the Beneficiary be irrevocably named. If so, You must have such Beneficiary's consent to any change. A request to make or change a designation must be in writing, on a form which meets Our needs. It will take effect as of the date it was signed, subject to receipt at Our Office. No change of Beneficiary shall bond Us in any way until it is received and processed.

(LH 11160-3)

## OWNERSHIP AND BENEFICIARY PROVISIONS (cont.)

**Reports to Owner**
Once each year We will mail an Annual Statement to You. This Statement will give the status of the insurance as of the end of the current report period. The Statement will include: the start and end of the current report period; the Cash Value at the end of the last and at the end of the current report period; the amount of premiums paid during the current report period; the amount of interest credited during the current report period; the Premium and Administrative Expense Charges paid during the current report period; the Cost of Insurance and the Cost of Riders, if any, deducted during the current report period; the amount of any Withdrawals paid during the current report period; the amount of any Loan Balance, and any loan repayments, and the loan interest charged during the current report period; the Death Benefit at the end of the current report period; the Surrender Value as of the end of the current report period. Other information will be included as required by law.

We will also give notice if further premium payments will be needed in order to keep the insurance in force until the end of the next report period.

**Projection of Benefits and Values**
Upon written request, We will provide You with a projection of the future expected benefits and value of the insurance. The request should be sent to Us. We may charge a reasonable fee for this projection.

The projection will be based on: a) assumptions You give as to Specified Amount and premium payments; and b) other assumptions We need to make, or You request. Such assumptions must be in compliance with applicable laws, regulations, rulings, and Group Policy revisions as described in this Certificate.

## PREMIUM AND REINSTATEMENT PROVISION

**Payment of Premiums**
The first premium for the insurance with respect to the Insured is due on or before the Certificate Date for the Insured. The insurance with respect to the Insured does not take effect until such first premium has been paid.

Premiums after the first may be paid to Us at any time prior to the Maturity Date. Premiums will be credited to Your Cash Value as of the dates they are received at Our Office.

Any amount We receive will be applied as a premium payment unless it is clearly marked for another purpose.

You may pay premiums through the Employer's payroll deduction plan. If authorized by You, the Employer will deduct Your Planned Premium for the insurance with respect to the Insured from Your salary and send it to Us.

Premium payment by payroll deduction will end on the first to occur of:

a)  the date You cancel Your authorization for payroll deduction;

b)  the date You terminate employment; or

c)  the date Your Employer terminates payroll deduction services.

If Your premiums are no longer paid by the payroll deduction plan, You may pay premiums directly to Us. We will send You premium notices once the payroll

deduction plan ends for You. We reserve the right to send premium notices no more frequently than quarterly.

**Flexible Premiums**
Premium payments are flexible. This means that within certain guidelines, You may choose both the amount and frequency of payments. You may maintain payments as planned, or may change the amount(s), frequency, or may make unscheduled additional premium payments. The actual premium amounts and frequency will affect the Cash Value, and may also affect the amount and duration of insurance benefits.

Since actual premium payments are made as You choose, You may choose not to make payments as planned or as changed. The insurance will be kept in force using the available Surrender Value.

Any premium payment amount must comply with Our rules regarding the least amount We will accept. We reserve the right to limit the amount of any changes to the Planned Premium or any additional premium payments. No premium payment may exceed the amount which, in Our opinion, is required to preserve the qualification of the Insured's insurance as a life insurance contract under Section 7702 of the Internal Revenue Code. Additional premium payments may be paid directly to Us at Our Office.

(LH 11160-4)

## PREMIUM AND REINSTATEMENT PROVISIONS (cont.)

If, as of any Certificate Anniversary, the premiums paid for the Insured's insurance exceed the amount allowable for the death benefit to qualify under Section 7702 of the Internal Revenue Code, the excess amounts of such premiums paid shall be refunded with interest at the rate of 4%. This excess amount, including interest, shall be refunded to You no later than 60 days after Your Certificate Anniversary.

We reserve the right to refuse to accept, to refund, or to ask for proof of insurability with respect to the payment of any premium amount which would cause increase in the Net Amount at Risk.

### Planned Premiums
The periodic premium that You pay is called the Planned Premium. While premiums are being paid by payroll deduction, the minimum monthly Planned Premium is the sum of:
a) the current Cost of Insurance and Cost of Riders charges; plus (+)
b) the monthly Administrative Expense Charge; plus (+)
c) the Premium Expense Charge.

You may request that the monthly Planned Premium be increased by an amount which will be directed to the Cash Value each Policy Month.

The Schedule shows the planned amount and frequency elected by You as of the Certificate Date.

### Grace Period
We will make Cost of insurance, the Cost of Riders and the monthly Administrative Expense Charge deductions from Your Surrender Value. However, when the Surrender Value at the start of any Policy Month is not enough to pay the monthly Cost of Insurance, Cost of Riders and the monthly Administrative Expense Charge, We grant 61 days of grace. The insurance with respect to the Insured stays in force during the days of grace.

Written notice will be sent to the Employer (while payroll deduction services are maintained to collect premiums under the Group Policy), to You, and to any assignee of record at the last address shown in Our records at least 31 days before the insurance will end. It will state the amount of premium which is needed to keep the insurance in force beyond the days of grace. You may send a premium payment (either directly or through the payroll deduction services of the Employer) at any time during the days of grace to keep the insurance in force be and the Grace Period.

If the required premium has not been paid when these 61 days of grace are over, the Certificate and the insurance with respect to the Insured will end.

If the Insured dies during the 61 days of grace, We will deduct the required unpaid amount from the Death Benefit.

### Continuation of Insurance
If no premium payments are made by You for more than 12 consecutive months, We guarantee that the benefit provided under the Group Policy and described in this Certificate will be at least equal to the benefit that would be provided if We applied Your Surrender Value to purchase an Extended Term benefit. We will calculate the benefit as of the start of the Policy Month on or next following the end of the 12 consecutive months of no premium payments, using the 1980 Commissioners Extended Term Mortality Table B, with a guaranteed interest rate of 4.0%. During this time, You may surrender Your Certificate at any time. See the Surrender Provisions. We will not pay You an amount less than the Surrender Value of this Extended Term benefit. This provision will not continue the insurance beyond the Maturity Date, nor continue an riders beyond their termination dates.

### Reinstatement
You may reinstate insurance which ended after the Grace Period. All of these conditions must be met:
a) You must make written request within five years of the date the insurance ended;
b) We must be given proof of insurability of the Insured;
c) We must be paid enough premium to make the Cost of insurance deductions for six months;
d) An Loan Balance must be restored or paid back.

We may contest the insurance with respect to proof of insurability We required for reinstatement. However, We may not contest the insurance with respect to such proof after the reinstated insurance has been in force during the Insured's lifetime for two years from the date of reinstatement except for non-payment of premium.

The reinstated insurance will take effect on the date We approve the application for reinstatement. The Cash Value on the date of reinstatement will be an amount which the premium paid will provide.

Any loan outstanding on the date the insurance ended which was restored will be taken into account in calculating the Cash Value.

## CASH VALUE PROVISIONS

**Cash Value**

If a premium is paid on or before the Certificate Date, Your Cash Value on the Certificate Date is equal to the total premium paid less the Premium Expense Charge. Otherwise, the Cash Value on the Certificate Date is zero.

On any date thereafter, Your Cash Value is equal to:

a) the Cash Value at the start of the Policy Month; less (-)

b) the monthly Administrative Expense Charge for the Policy Month; less (-)

c) the Cost of Insurance and the Cost of Riders for the Policy Month; plus (+)

d) interest credited on the net of the above three items from the start of the Policy Month to the day on which the Cash Value is being determined; plus (+)

e) premiums less the Premium Expense Charge credited to the insurance since the start of the Policy Month; plus (+)

f) interest on the premiums less the Premium Expense Charge from the day(s) the premiums are credited to the Cash Value to the day on which the Cash Value is being determined.

Withdrawals made by You will reduce Your Cash Value as of the dates We process them. The reduction will affect the crediting of interest described above.

**Interest Rates**

The guaranteed effective annual interest rate is shown in the Schedule. We may credit a higher rate to all or part of the Cash Value.

No interest in excess of the guaranteed rate will be credited to the Cash Value Base shown in the Schedule.

No interest in excess of the guaranteed rate will be credited to that portion of the Cash Value which equals the Loan Balance.

**Cost of Insurance**

The Cost of insurance is equal to the product of the Risk Rate and the Net Amount at Risk with respect to the Insured for the Policy Month. We subtract this Cost Insurance from the Cash Value each Policy Month.

**Risk Rate**

The Table of Risk Rates, Table 1 of the Schedule, shows the guaranteed maximum monthly risk rates We can charge for the Cost of Insurance. The Insured's Age, and Class determines which guaranteed rate applies. We may charge a lower rate. We determine Our current Risk Rates based on Our expectation of future mortality. We reserve the right to change Our current rates if We expect a change in the mortality factor. Such current rates will apply to all Insureds of the same Age and Class.

**Net Amount at Risk**

The Net Amount at Risk with respect to the Insured for each Policy Month is equal to:

a) the Death Benefit divided by 1.0032737; less (-)

b) the Cash Value at the start of the Policy Month after deductions for the Cost of Insurance, the Cost of Riders, and the Administrative Expense Charge that month.

**Basis of Values**

The mortality table used to determine guaranteed minimum values and benefits for an Insured's Age and Class is the 1980 Commissioners Extended Term Mortality Table B. The guaranteed interest rate used in such determination is 4.0%. The surrender values are at least as great as those required by law in the state in which the Group Policy is delivered. A detailed statement of the method used to compute those value has been filed with the Insurance Department in the state in which the Group Policy is delivered.

## INSURANCE COVERAGE PROVISION

**Term of Insurance for an Insured**

Insurance on the life of the Insured will take effect on the Certificate Date shown in the Schedule. Insurance on the life of the Insured will stay in force until the first Termination Event occurs. Termination events are:

a) the Maturity Date.

b) the end of the period for which You have sufficient Surrender Value to make Cost of Insurance, Cost of Rider, and Administrative Expense Charge deductions subject to the Grace Period section.

**Benefit Payments**

We will pay the appropriate amount when:

a) We receive due proof that the Insured has died;

b) You surrender Your Certificate; or

c) You request a Withdrawal or loan; or

d) the Maturity Date occurs.

All amounts will be paid from Our Office. We may require that You return Your Certificate to Us before We make payment.

(LH 11160-6)

## INSURANCE COVERAGE PROVISIONS (cont.)

Any amount We pay is subject to the terms of the Group Policy as described in this Certificate. The amount may be affected by the Incontestability, Misstatement of Age, Suicide, Grace Period and Loans sections.

### Death Benefit

The Minimum Death Benefit with respect to the Insured is determined by the factor shown in the Minimum Death Benefit Table of the Schedule for the Insured's Age on the date of death.

If You owe Us:
a) any Loan Balance; or
b) any unpaid Cost of Insurance, Cost of Riders, or Administrative Expense Charges, if death occurs during the Grace Period;

We will recover it from any amount payable on death. Any amount payable on death will be increased by an unearned loan interest.

The Death Benefit with respect to the Insured is equal to the greater of:
a) the Specified Amount plus the Cash Value at the time of death; or
b) the Minimum Death Benefit.

This means that the Cash Value is considered separately from the Specified Amount shown in the Schedule. Thus, these two amounts are combined to determine the Death Benefit.

### Specified Amount

The Specified Amount with respect to the Insured is shown in the Schedule. After the insurance has been in force for one year, You may make written request for a change in the Specified Amount if permitted under the Group Policy. The Schedule indicates if changes are permitted. Your request should be mailed to Us, on a form which meets Our needs.

If You ask to increase the Specified Amount You will need to submit a supplemental application. We may also require proof of insurability of the Insured. The increase will take effect at the start of the Policy Month on or next following the date We approve the supplemental application. The portion of the Specified Amount which represents the increase will be issued using the Insured's class at the time the increase takes effect.

If You ask to decrease the Specified Amount You will need to submit a supplemental application and request a Partial Surrender. The decrease will take effect at the start of the Policy Month on or next following the date We approve the supplemental application. If there have been increases in the Specified Amount, the decrease in the Specified Amount will be applied:
a) first to reduce the amount provided in the most recent increase; then

b) to reduce the next most recent increase(s), in successive order; then
c) to reduce the initial Specified Amount.

The Specified Amount after the decrease may not be less than the Minimum Specified Amount shown in the Schedule.

### Maturity Date

The Maturity Date with respect to the Insured is shown in the Schedule. it is the last date on which You may elect to:
a) end the insurance;
b) stop paying premiums; and
c) receive the Surrender Value.

If the Insured is alive on the Maturity Date, We will pay You the Surrender Value, if any, and Our duties to You under the Group Policy as described in this Certificate will end. In no event may the insurance on the life of the Insured continue in force beyond the Maturity Date.

The insurance may end prior to the scheduled Maturity Date. The factors which would cause an early termination include:
a) frequency and amount of premium payments;
b) any change(s) You make in the Specified Amount;
c) the actual interest rate used to calculate the Cash Value;
d) the Risk Rates in effect; and
e) any loans or Withdrawals You make.

### Claims of Creditors

Unless otherwise provided by law, the benefits provided under the Group Policy as described in this Certificate are not subject to claims of: a) the creditors of the Insured; b) the creditors of any Beneficiary; nor c) Your creditors.

### Compliance

The Group Policy and the insurance provided under this Certificate are designed to qualify as a life insurance contract under Section 7702 of the Internal Revenue Code, as amended. We have the right to:
a) limit or decline Your payments;
b) limit or decline Specified Amount changes; and
c) take other action We deem necessary to preserve the qualification of the Group Policy and the insurance provided under this Certificate as a life insurance contract under Section 7702 of the Internal Revenue Code as amended.

We reserve the right to make any adjustment necessary for the Group Policy and this Certificate to comply with any applicable federal or state law, regulation or rule. We will send the Employer and You notice of any such adjustment.

We will amend the Group Policy and Your Certificate as necessary .

(LH 11160-7)

## LOAN PROVISIONS

### Cash Loans

You may make written request for a loan at any time, provided the insurance is in force. The request should be sent to Us, and must be on a form which meets Our needs. This Certificate is sole security for the loan. We may delay making a loan for up to 6 months from the date of Your request. We will not delay making a loan if the amount is to pay premiums to Us. The total amount of outstanding loans plus interest due on the loans is called the Loan Balance.

### Maximum Loan Amount

The maximum amount You may borrow is equal to:
a) The Surrender Value as of the date We receive the request; less (-)
b) interest payable in advance to the next yearly anniversary; less (-)
c) the Cost of Insurance and Cost of Riders and Administrative Expense Charges, until the next Certificate Anniversary.

The amount You borrow will be added to any existing loan increasing Your Loan Balance.

### Interest

We will charge interest on a loan to You at an annual rate of 5.7% payable in advance. This is equivalent to an effective annual rate of 6.0%. On each Certificate Anniversary, interest is due and payable in advance to the next Certificate Anniversary. However, the interest from the date of the loan until the next Certificate Anniversary is due on the date of the loan. If interest is not paid when due it will become part of

the loan. We will charge interest on it too.

The amount of Cash Value which secures Your Loan Balance will only be credited with interest at the Guaranteed Interest Rate. The interest due on the Loan Balance will therefore exceed the interest We credit to amounts securing the Loan Balance.

### Repayment

You may repay all or part of the Loan Balance at any time while the insurance is in force. Any loan or interest repayments should be mailed to Us, clearly marked as a loan or interest repayment. Any payments not so marked will be assumed to be premiums. When We settle the insurance with respect to the Insured, the amount to be paid will be reduced by the amount of Loan Balance and increased by any unearned loan interest.

### Excess Loan Balance

Increases in the Loan Balance may cause the insurance with respect to an Insured to end in accordance with the Grace Period section. We will give at least 31 days advance written notice to the Employer (while payroll deduction services are maintained to collect premiums under the Group Policy), to You, and to any assignee of record at the last address shown in Our records. In the notice We will state the amount which if paid to Us would reduce the Loan Balance enough to keep the insurance in force for a limited time.

## SURRENDER PROVISIONS

A surrender means a decrease in the Specified Amount with respect to an Insured. You may make written request for a surrender at any time before the Maturity Date. The request should be sent to Us, and must be on a form which meets Our needs.

**Full Surrender** — You may request the payment of all of the Surrender Value. This will completely decrease the Specified Amount, and is called a Full Surrender. This Certificate must be returned to Us.

Your Surrender Value is equal to:
a) the Cash Value; less (-)
b) any Loan Balance.

If You request a Full Surrender within 30 days after a yearly anniversary, the Surrender Value will not be less than it was on that anniversary after adjustment for Cost of Insurance and Cost of Rider deductions, Administrative Expense Charges, any loans, and any Withdrawals and Service Fees since that date.

We may delay the payment of the Surrender Value for up to 6 months from the date of the request. The Full Surrender will take effect as of the date We process it. The insurance will end as of that date.

### Partial Surrender

You may request a partial decrease in the Amount. This is called a Partial Surrender. The insurance will stay in force with the decreased Specified Amount. After the decrease, the Specified Amount may not be less than the Minimum Specified Amount shown in the Schedule.

If there have been increases in the Specified Amount a decrease in the Specified Amount will be applied: a) first to the amount provided by the most recent increase; then b) to reduce the next most recent increases, in successive order; then c) to reduce the initial Specified Amount.

(LH 11160-8)

## WITHDRAWAL PROVISIONS

A Withdrawal means the payment of part of Your Surrender Value. You may make written request for Withdrawal at any time, provided the insurance is in force. The request should be sent to Us, and must be on a form which meets Our needs. We may delay the payment of the Withdrawal for up to 6 six months from the date of the request. We will not delay the payment of a Withdrawal if the amount is to pay premiums to Us.

We will deduct the Service Fee as shown in the Schedule from the Cash Value when We process a Withdrawal request. The Cash Value will be reduced by the amount of the Withdrawal plus the Service Fee.

The minimum amount You may request as a Withdrawal is $500. The maximum amount You may request is the Surrender Value less an amount required to provide for the Cost of Insurance, the Cost of Riders, the Service Fee, and the Administrative Expense Charges for six (6) months.

## CONTINUATION OF GROUP POLICY BENEFITS

If the Group Policy is cancelled, the insurance benefit with respect to the Insured may continue. The Employer must give Us all the data We need to continue to administer such insurance benefits. Such data includes Your address and the address of the Insured as of the date the Group Policy is cancelled.

You will be given written notice of the cancellation of the Group Policy at least 30 days prior to the date of such cancellation. The notice will state that premiums may be paid to Us at Our Office. The notice will specify the amount of premium which the Employer was remitting and identify modal options available.

Direct premium payments should start at the start of the Policy Month next following the date the notice is sent. If a direct payment is not made the insurance with respect to the Insured will stay in force as long as

there is sufficient Surrender Value as stated in the Continuation of Insurance section.

You will continue to have the same rights and privileges as You had prior to the date the Group Policy was cancelled.

After the Group Policy is cancelled We will not allow new persons to become Insureds under the Group Policy. We will continue the insurance benefits with respect to all Insureds who were Insured on the date the Group Policy is cancelled until the insurance with respect to such Insureds would end as stated in the Term of Insurance of an Insured section.

## EXCHANGE PRIVILEGE PROVISION

### Exchange Benefit
You may use the Surrender Value of the Insurance to purchase paid-up endowment at 95 insurance on the life of the Insured. You may make written request for the purchase at any time while the insurance is in force. The request must be made on a form which meets Our needs.

The effective date of the new insurance will be the start of the Policy Month on or next following the date We receive Your request. Your Certificate must be returned to Us. The insurance with respect to the Insured will terminate the day before the new insurance takes effect.

### New Paid-Up Insurance
The amount of paid-up endowment at 95 insurance may be up to that which can be purchased by applying Your Surrender Value as a net single premium at the rates shown in the Schedule, or the rates We are then using for that purpose, if lower. If the Surrender Value is more than is required to purchase the new insurance We will pay You the excess.

These rates are per $1,000 amount of insurance, and are based on the Insured's Age and Class on the date the new insurance takes effect. These rates are based on the 1980 Commissioners Extended Term Mortality Table B at 4% interest.

9

(LH 11160-9)